IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
NOV 0 8 2023
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES OF AMERICA,

   v.

               23-MR- 491 - V

ANDREW CLEMENTS a/k/a Tiger,

     Defendant.

---

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO REVOKE THE MAGISTRATE JUDGE'S DECISION AND ORDER**

  The United States of America by and through its attorneys, Trini E. Ross, United

States Attorney for the Western District of New York, and Louis A. Testani, Assistant United

States Attorney, of counsel, hereby file this Memorandum of Law in Support of its Motion to

Revoke the Magistrate Judge's Decision and Order.

## I.  INTRODUCTION AND BACKGROUND

  On October 26, 2023, the Honorable Michael J. Roemer, United States Magistrate

Judge for the Western District of New York, signed a criminal complaint charging the

defendant and his codefendant, Jessica Leyland, with a violation of Title 21, United States

Code Section 846 (narcotics conspiracy) and multiple counts of Title 21, United States Code,

Section 841(a)(1) (possession with intent to distribute, and distribution of, cocaine).[1]  (Dkt.

No. 1, Case No. 23-mj-5229).   The narcotics charges in the complaint stem from four

controlled purchases of suspected cocaine from the defendant or his codefendant conducted

---

[1] Leyland was also charged with multiple counts of witness tampering.

by law enforcement agents operating in an undercover capacity.

The defendant was arrested on October 31, 2023, and, simultaneously, law enforcement executed federally authorized search warrants on the defendant's residence and vehicle.  From within the defendant's residence, located at 30 Euclid Place, Upper Front, Buffalo, NY, law enforcement recovered the following items: a loaded Polymer80 9mm pistol; the lower receivers, upper receivers, and associated components for three additional Polymer80 pistols, and two Polymer80 AR-15-style assault rifles; a 12-gauge shotgun; a body armor vest with associated plate inserts; five high-capacity rifle magazines; over two thousand rounds of ammunition; $2,791.00 dollars of United States currency; suspected cocaine; suspected marijuana; and various items indicative of narcotics trafficking including packaging materials, a digital scale, razor blade, and a plastic card bearing suspected cocaine residue; and item used to grow and process marijuana plants.  The defendant's cellular telephone was also seized and is being reviewed pursuant to a federally authorized search warrant.  Finally, suspected heroin/fentanyl was recovered from the defendant's vehicle.

On October 31, 2023, Judge Roemer presided over the defendant's Initial Appearance. The government moved for detention and the defendant requested an adjournment, pending a final bail report.  The detention hearing was subsequently scheduled for November 6, 2023. On November 6, 2023, following the government's proffer and oral argument, Judge Roemer ordered the defendant released to inpatient treatment.  Judge Roemer then granted a stay of his order for 24-hours while the government seeks this Court's review.

This Court should reverse Judge Roemer's order. There are no conditions that can reasonably assure the safety of the community or the defendant's future appearance.

## II.    STANDARD OF REVIEW

Review of a magistrate judge's release order is *de novo*. "[W]here a defendant is ordered released by a magistrate judge, the government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court. Upon such motion, the district court must perform a *de novo* review of the magistrate judge's release order." *United States v. Boorman*, 130 F. Supp. 2d 394, 398 (W.D.N.Y. 2001) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985)). Under that standard, the district owes no deference to the magistrate judge's decision but, rather, must "reach its own independent conclusion." *Leon*, 766 F.2d at 80; *see also United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985). Moreover, the reviewing district court is not limited to the record made within the magistrate court. Instead, the Court may take additional evidence or conduct a new evidentiary hearing altogether. *See Boorman*, 130 F. Supp. 2d at 398 ("When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence."); *see also Colombo*, 777 F.2d at 98.

## III.    LEGAL FRAMEWORK

Section 3142 of Title 18, enacted as part of the Bail Reform Act of 1984, *see* 18 U.S.C. §§ 3141-56 ("Bail Reform Act"), requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), "the judicial officer finds that no condition

or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

Subsection (e) of § 3142 provides that there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure" the defendant's appearance or the safety of the community, where probable cause supports a finding that the person seeking bail committed certain types of offenses, including "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)." 18 U.S.C. § 3142(e)(3)(A). Where there is such a presumption, the defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Notably, even if a defendant carries this burden of production, the significance of the presumption does not disappear. Rather, "it 'remains a factor to be considered among those weighed by the district court.'" *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436)).

The factors that the judicial officer must consider "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," include "the nature and circumstances of the offense charged, including whether the offense . . . involves a controlled substance"; "the weight of the evidence against the person"; "the history and characteristics of the person,"

4

including his "physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Importantly, the same factors are to be considered in determining "whether the presumptions of dangerousness and flight are rebutted." *Mercedes*, 254 F.3d at 436.

Finally, "[t]he facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." *Id.* § 3142(f)(2); *see also United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (noting that the government "has the burden of establishing defendant's dangerousness by clear and convincing evidence"). However, where the government moves for detention based upon a risk of flight, the government need only establish by a preponderance of the evidence that the defendant "if released, presents an actual risk of flight." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d. Cir. 2007) (citation omitted).

## IV.   ARGUMENT

The defendant should be detained. The defendant cannot carry his limited burden to rebut the presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the

community."  § 3142(e).  Additionally, irrespective of the presumption, the government can

show by clear and convincing evidence that no condition or combination of conditions can

reasonably assure the safety of the community upon his release.  And, likewise, it can show

by the preponderance of the evidence that the defendant presents a risk of nonappearance.


A.      **Under the Bail Reform Act, Detention is Presumed, and the Defendant Cannot Rebut That Presumption**

The defendant cannot overcome the Bail Reform Act's presumption under 18 U.S.C.

§§ 3142(e)(3)(A) that no condition or combination of conditions will reasonably assure the

safety of the community and his appearance if he is released.  The presumption arises in this

case by the fact that the four narcotics charges against the defendant in the complaint trigger

the statutory presumption under 18 U.S.C. § 3142(e)(3)(A), because the maximum term of

imprisonment is 20 years.  *See id.* § 3142(e)(3)(A) (providing that the presumption applies to

"an offense for which a maximum term of imprisonment of ten years or more is prescribed in

the Controlled Substances Act").


Defendant's arguments to overcome the presumption are unavailing.  During the

November 7, 2023, detention hearing, the defendant: (1) attacked the strength of the

government's proof[2]; (2) argued that the defendant had a relatively limited criminal history;

---

[2] Specifically, the defendant argued that conduct attributed to his codefendant, proffered by the government at her detention hearing, namely, her involvement with Pharoah's Gentleman's Club and her stag company "Xtraordinary Entertainment"; that the government failed to offer photographic evidence of the drugs and a 3D printer found in the defendant's residence, as it had done with the seized firearms; that the seized drugs were not field tested; and that the government had not demonstrated that the defendant possessed the firearms in furtherance of narcotics trafficking.

and (3) stated that the defendant would submit to inpatient treatment as a condition of release. (Dkt. No. 12 at 29-35.)  In finding that the presumption had been rebutted, Judge Roemer held that "I base my finding on several factors. [The defendant] has a very limited criminal history, none of which appears to involve drugs. They all appear to involve some kind of domestic issues that he had at one point. He is presumed innocent of these charges. Again, he has a limited criminal history." (*Id.* at 42.)

The reason's offered by the defendant, and relied on by Judge Roemer, are insufficient to rebut the presumption.  The defendant's argument with respect to the strength of the evidence is without merit for reasons that will be discussed more thoroughly *infra*.  However, even if the argument were legitimate, and even coupled with the defendant's limited criminal history, the presumption is not rebutted. *See U.S. v. Artisc*, 607 F. App'x 95, 97 (2d Cir. 2015) ("At the detention hearing, [the defendant] attempted to rebut the § 3142(e)(3) presumption in favor of detention by pointing to the purported weakness of the government's case and his own lack of a prior criminal record.  These circumstances are not so compelling as to defeat the presumption."); *see also U.S. v. Tomero*, 169 F. App'x 639, 640 (2d Cir. 2006) ("Defendant argues that the district court 'committed clear error' because it failed to give due consideration to evidence he claims rebuts the presumption against pre-trial release in § 3142(e), including his U.S. citizenship, lack of criminal history, 'solid' employment record, and 'substantial bail package.' We disagree.").  Additionally, the fact that the defendant would agree to inpatient treatment *as a condition* of his release, logically, cannot serve to rebut the presumption that no *condition of combination of conditions* will

reasonably assure the appearance of the person as required and the safety of the community.

**B.    There is No Condition or Combination of Conditions That Can Reasonably Assure the Safety of the Community and the Defendant's Appearance if he is Released**

Furthermore, even if the presumption were to be rebutted, the government can meet its burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community, and by a preponderance of the evidence that he poses a risk of nonappearance. Specifically, the evidence—when viewed through the prism of the 3142(g) factors and alongside the presumption—shows that there is no condition or combination of conditions that can reasonably assure the safety of the community or the defendant's appearance if he is released.

**1.    Nature and Circumstances of the Offenses Charged**

The defendant is charged with several serious drug offenses in the instant complaint. While the nature of these offenses themselves illustrate the defendant's dangerousness, the safety of the community is further called into question when the nature and circumstances of the charged offenses are considered in connection with the fact that seven firearms—two of which were AR-15-style assault rifles, and six of which were "ghost guns"—along with five high-capacity magazines, thousands of rounds of ammunition, a bullet proof vest, and 3D printer were recovered from the defendant's residence, along with additional items indicative of narcotics trafficking. While the defendant is not charged with firearms offenses at this time, because the complaint predated their discovery by law enforcement, the danger that the defendant poses to the community by possessing such weapons and ammunition may, and

should, be considered by this Court.  *See United States v. Barone*, 387 F. App'x 88, 90 (2d Cir. 2010) (affirming detention order based, in part, on uncharged crimes); *see also United States v. Bruno*, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015) ("[T]he Court may consider uncharged conduct in assessing the degree of danger posed by a defendant's release." (citing *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991)).

The charges in the complaint against the defendant stem from several controlled purchases of suspected cocaine from the defendant during the month of October 2023, utilizing an undercover law enforcement member.  Specifically, after being introduced to the defendant by his codefendant, the undercover telephonically arranged to purchase cocaine from the defendant on three separate occasions.  On October 13, 2023, the defendant sold the undercover approximately three and a half grams of suspected cocaine; and on October 19, 2023, and October 24, 2023, the defendant sold the undercover approximately seven grams of suspected cocaine.  Prior to each purchase the defendant was observed proceeding directly to the location of the controlled purchase from him residence.

Then, at the time of the defendant's arrest, a search warrant was executed on that residence.  There, law enforcement recovered additional evidence of the defendant's narcotics trafficking.  Namely, approximately 6.7 pounds of suspected marijuana, and approximately 6.6 grams of suspected cocaine, individually bagged in a manner consistent with the cocaine sold to the undercover.  Additional items indicative of the fact that the premises was being utilized to facilitate the defendant's narcotics trafficking were also recovered, including

9

packaging materials, a digital scale, razor blade, and a plastic card, all containing suspected cocaine residue; as well as item used to grow marijuana plants, including tents, the requisite chemicals, and a rotary evaporator, which is a machine used to purify and concentrate cannabinoids.   The narcotics and distribution-related items seized from the defendant's premises alone indicate the danger he poses to the community.  *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) ("It is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'" (citation omitted)).

However, that is just the tip of the iceberg.  Directly attached to the defendant's bed, and mere feet away from the area in which the defendant was packaging/process cocaine, was a holster containing a loaded Polymer80 "ghost gun," depicted below, with emphasis:





"Ghost guns" are typically sold as federally unregulated "kits," widely available on the internet, which, with the addition of a few unregulated and widely available firearms components, and, once assembled, become fully functional firearms without a serial number. Because the ghost gun kits, and the additional components needed to transform the kits into operable firearms, are all separately unregulated, they do not need to be acquired from an individual or establishment with a Federal Firearms License (FFL) or by submitting to a background check. Just as concerning, these guns bear no serial number, and, thus, are untraceable. These properties make ghost guns highly desirable to those in the drug trade, "the weapon of choice for many violent criminals," and "the fastest-growing gun safety problem facing our country." *See Fact Sheet: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership it Needs to Enforce Our Gun Laws*, THE WHITE HOUSE

(Attached hereto as Exhibit A); *Issues: Ghost Guns*, EVERYTOWN (Attached hereto as Exhibit B).

Five additional ghost guns were recovered from the residence, along with a 12-gauge shotgun. The five additional "ghost guns" were in various stages of assembly, however, all could be fully assembled and rendered functional with relative ease. Three of the additional ghost guns were handguns, the remaining two were AR-15-style assault rifles. Additionally, five high-capacity AR-15 magazines were recovered. These firearms and associated high-capacity magazines are depicted below:








A 3D printer was also found within the residence. 3D printers can be utilized to create ghost guns, or, to create modified parts for firearms, commonly known as "glock switches," "auto-sears," or "machine gun conversion devices," which, once equipped to the firearm, allow to firearm to fire automatically and expel multiple rounds in a matter of seconds. In order to utilize one of these devices on multiple occasions, or for a sustained period of time, due to the rapid rate of fire they produce, large quantities of ammo are required. To that point, recovered from the defendant's residence was over 2,000 rounds of ammunition.

Finally, a bullet proof vest was also recovered, along with "level IV" ballistic plate

inserts.  Level IV ballistic plate inserts provide the highest level of protection from firearms, capable of stopping high-powered rifle and armor piercing rounds.  The purchase of these bullet proof vests was made illegal in New York following the Tops Market mass shooting, and a bullet proof vest was worn by the shooter during the attack.

In summary, the defendant possessed seven firearms, the majority of which constituted untraceable ghost guns.  Two of these ghost guns were AR-15-style assault rifles. Additionally, the defendant possessed five high-capacity magazines, over 2,000 rounds of ammunition, and a military-grade ballistics vest.  While commons sense dictates the dangers that these items, especially when considered in combination, pose to the community, such danger is also thoroughly developed in the applicable case law.  In *United States v. Pierce*, this Court noted the fact that controlled substances and drug paraphernalia were recovered from a defendant's alleged drug premises in and of itself posed a danger to the community.  *See* No. 16-MR-144, 2016 WL 7421925, *3.  The Court then continued:

> [B]eyond that, the firearms that the defendants allegedly possessed in connection with their drug operation are especially worrisome. In the alleged drug premises, the government recovered six firearms. The handles of some firearms were covered in electrical tape, suggesting that they were ready to be used in criminal activity, with the tape—and fingerprints on it—able to be removed easily. Two of the firearms were semi-automatic rifles. Multiple firearms, including one of the rifles (apparently a United-States-marketable AK-47 clone), also appear to have been loaded with high-capacity magazines in violation of New York law. Possessing such firearms during and in relation to the alleged drug trafficking crimes is very serious and weighs *heavily* in favor of detention.

*Id.* (emphasis added).  The scenario addressed by the Court in *Pierce* is precisely what we have here.  While seven firearms were recovered here, compared to the six recovered in *Pierce*, as

was the case in *Pierce*, two of the firearms recovered from the defendant's residence were "semi-automatic rifles." *Id.* Additionally, the same logic applied by the Court with respect to the electrical tape wrapping applies to fact that six of the firearms recovered from the defendant's residence were ghost guns. While an individual may wrap the handle of a firearm in tape in order to prevent being connected to that firearm via fingerprints, an individual would similarly seek to acquire or manufacture a "ghost gun" to avoid being connected to those firearms via a serial number trace. Finally, as was the case in *Pierce*, the defendant here possessed five "high-capacity magazines in violation of New York law." *Id.* As noted in *Pierce*, these factors weigh "heavily" in favor of detention.

*Pierce* does not exist on an island in a sea of contrary caselaw. In fact, the opposite is true. *See United States v. Sternquist*, 22-MJ-1005, 2022 WL 6162532, *3 (E.D.N.Y. Oct. 8, 2022) ("Notwithstanding the fact that the government has now seized these particular firearms, the suggestion remains that [the defendant] has the ability to obtain weaponry in substantial quantities — including *untraceable weaponry* — all of which weighs in favor of a dangerousness finding." (emphasis added and citation omitted)); *United States v. Vasconcellos*, 519 F. Supp. 2d 311, 319 (N.D.N.Y. 2007) (finding that the defendant's "current drug trafficking behavior, including that associated with [his possession of] ammunition and handguns, has been dangerous," and ultimately holding that "there are no release conditions that would preclude his risk of danger"); *see also United States v. Rivera*, 509 F. Supp. 3d 13, 17 (W.D.N.Y. 2020) ("Drug traffickers possessing firearms constitutes especially dangerous activity and it unfortunately generates a significant amount of violence

in this community.").

Finally, not only does the defendant's possession of these firearms, high-capacity magazines, body armor, and ammunition constitute a danger to the community, but the facts as posited above support an 18 U.S.C. § 924(c) charge. While not charged in the complaint, which predated law enforcement's discovery of the defendant's possession of firearms in furtherance of drug trafficking, the defendant understands he will be held accountable for his actions in a future charging instrument. A 924(c) conviction carries with it a five-year mandatory minimum sentence, which must be imposed consecutively. 18 U.S.C. § 924(c)(1)(A)(i). Accordingly, the defendant has a clear incentive to flee. *See United States v. Vasconcellos*, 519 F.Supp.2d 311, 319 (N.D.N.Y. 2007) ("Given the severe sentence [the defendant] is confronting and his lack of assets, he is a flight risk. . . . There are no release conditions that would preclude his risk of . . . flight.").

### 2.   Weight of the Evidence

The weight of the evidence against the defendant is strong. The controlled purchases conducted by undercover law enforcement, as well as the communications arranging the purchases, are all recorded and/or preserved. Additionally, the defendant was the sole occupant of his residence, and a loaded firearm was found attached via a holster to the defendant's bed—presumably in preparation for a drug-related conflict—mere feet from the area that items used to process/package cocaine were recovered. In fact, with respect to the firearms, defense counsel admitted that "[a]gain, I can't necessarily rebut the guns . . . that

were found in my client's apartment." (Dkt. No. 12 at 32.)  Accordingly, the proof related to the counts charged in the complaint, as well as a future § 924(c) charge is strong.  *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("Possession of equipment to weigh, cut and package drugs is highly probative of a purpose to distribute," as is "possession of . . . [a] loaded firearm."); *United States v. Wahl*, 290 F.3d 370, 376-77 (D.C. Cir. 2002) (affirming conviction under § 924(c) where loaded gun was within defendant's reach and in close proximity to defendant's drug stash).  The strength of the proof in this case, coupled with the period of incarceration that the defendant faces, makes the defendant a clear risk of nonappearance.  In fact, and as discussed in more detail below, the defendant has indicated to law enforcement that he was considering taking his own life given the potential consequences he faces.

### 3.    History and Characteristics of the Defendant

The third factor similarly weighs against the defendant's release from custody.  First, looking to the bail report prepared by United States Probation, the defendant has no discernable ties to the Buffalo area.  He is unemployed, and has been for some time, and has no family in the area.  While the defendant has been a Buffalo resident for approximately six years, prior to that time period he resided in Florida, Georgia, Virginia, and "a few other states, that he was unable to recall."  In fact, when directly asked by Judge Roemer "[w]hat is [the defendant's] connection to this community?" defense counsel could not provide an answer beyond that fact that the defendant's father, who is now deceased, once lived here. (Dkt. No. 12 at 34.)

What is more concerning, however, is that the bail report further details that the defendant has been diagnosed with serious mental health conditions, including PTSD and depression, for which "[h]e refuse[s] to take any medication prescribed." Instead, the defendant "self-medicates" by "drink[ing] alcohol daily until he can't drink anymore" along with using cocaine and marijuana. This behavior, when combined with the defendant's possession of untraceable assault-rifles and handguns, a bulletproof vest, and over two thousand rounds of ammunition, make the danger the defendant poses to community, and himself, clear as day.

This point is emphasized by statements made by the defendant upon his arrest. After being mirandized and questioned by law enforcement regarding the conduct charged in the complaint, and, specifically, that the conduct was witnessed by law enforcement, the defendant responded, "I don't know guys, I don't remember." The defendant also remarked that his "memory isn't the best" and that he couldn't "remember what [he] did last night" going on to attribute this, in part, to substance abuse as well as commenting that he had "issues, mental issues." While being transported to the custody of the United States Marshals Service, and, unprovoked by any questions from law enforcement, the defendant made a series of utterances regarding suicide and death, including that, given the potential criminal consequences he is facing, "I might as well hang it up," or, "end it all now." The defendant also exhibited somewhat paranoid behavior, remarking that the reason he had acquired the firearms at issue was because gun shops were selling out and "embassies in Iran were getting bombed" so he "need[ed] to protect [him]self."

18

Additionally, beyond the danger this combination of factors poses to the community, courts have also recognized that "in addition to the issue of safety [courts must] also consider whether there are conditions of release which will 'reasonably assure the appearance of the person as required'-and in that regard, . . . may consider the possibility that defendant will . . . attempt suicide." *U.S. v. Metz,* No. 12-M-01193, 2012 WL 6632501, at *4 (W.D.N.Y. Dec. 12, 2012).

### 4.    Nature and Seriousness of the Danger to Any Person or the Community

The defendant had access to multiple untraceable firearms, including AR-15 style assault rifles, five high-capacity magazines, bullet proof body armor, and over two thousand rounds of ammunition.  Beyond this, the defendant has acknowledged his mental health struggles, for which he is refusing medication.  The defendant also has severe substance abuse problems, "drink[ing] alcohol daily until he can't drink anymore."  This combination of factors, along with the defendant's comments regarding suicide, demonstrate the clear danger the defendant poses to the larger community, and himself, if released, which has been more thoroughly discussed *supra*.

### CONCLUSION

The defendant's release poses a serious risk of danger to the community and a serious risk of nonappearance.  No condition or combination of conditions can lessen this risk to a point where the defendant's appearance, nor the safety of the community, can be reasonably

assured.  For the reasons stated above, the government respectfully requests that the District Court revoke Magistrate Judge Roemer's November 7, 2023, decision and order the defendant be detained pending trial.


DATED:  Buffalo, New York, November 7, 2023.


TRINI E. ROSS
United States Attorney

By:

Louis A. Testani
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716.843.5894
Louis.Testani@usdoj.gov

20

EXHIBIT A

APRIL 11, 2022

# FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership it Needs to Enforce Our Gun Laws

Today, President Biden and Deputy Attorney General Lisa Monaco will deliver remarks in the Rose Garden to announce additional steps the Administration is taking to combat gun crime.

**Ensuring that ATF has the leadership it needs to enforce our commonsense gun laws and fight gun crime.**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is our top federal law enforcement agency responsible for enforcing our commonsense gun laws. Today, the President is nominating Steve Dettelbach to serve as Director of ATF.

Dettelbach is a highly respected former U.S. Attorney and career prosecutor who spent over two decades as a prosecutor at the U.S. Department of Justice. He has received bipartisan praise and support from law enforcement for his work. In 2009, he was unanimously confirmed for his position as U.S. Attorney for the Northern District of Ohio. He has a proven track record of working with federal, state, and local law enforcement to fight violent crime and combat domestic violent extremism and religious violence – including through partnerships with the ATF to prosecute complex cases and take down violent criminal gangs. Dettelbach also worked closely with local law enforcement and community leaders to develop and implement data-driven and neighborhood-based efforts to prevent and fight violent crime. His leadership and his record of innovation in fighting crime and violence make him ready from day one to aggressively and creatively address these pressing issues at the Director of ATF.

**Cracking down on ghost guns – the weapon of choice for many violent criminals**

Today, the President and Deputy Attorney General will also announce that the U.S. Department of Justice has issued a final rule to rein in the proliferation of "ghost guns" – unserialized, privately-made firearms that law enforcement are increasingly recovering at crime scenes in cities across the country. Last year alone, there were approximately 20,000 suspected ghost guns reported to ATF as having been recovered by law enforcement in criminal investigations – a ten-fold increase from 2016.[1] Because ghost guns lack the serial numbers marked on other firearms, law enforcement has an exceedingly difficult time tracing a ghost gun found at a crime scene back to an individual purchaser.

This final rule bans the business of manufacturing the most accessible ghost guns, such as unserialized "buy build shoot" kits that individuals can buy online or at a store without a background check and can readily assemble into a working firearm in as little as 30 minutes with equipment they have at home. This rule clarifies that these kits qualify as "firearms" under the Gun Control Act, and that commercial manufacturers of such kits must therefore become licensed and include serial numbers on the kits' frame or receiver, and commercial sellers of these kits must become federally licensed and run background checks prior to a sale – just like they have to do with other commercially-made firearms.

The final rule will also help turn some ghost guns already in circulation into serialized firearms. Through this rule, the Justice Department is requiring federally licensed dealers and gunsmiths taking any unserialized firearm into inventory to serialize that weapon. For example, if an individual builds a firearm at home and then sells it to a pawn broker or another federally licensed dealer, that dealer must put a serial number on the weapon before selling it to a customer. This requirement will apply regardless of how the firearm was made, meaning it includes ghost guns made from individual parts, kits, or by 3D-printers.

This rule builds on the Biden Administration's prior executive action to rein in the proliferation of ghost guns. In February 2022, the U.S. Department of Justice launched a National Ghost Gun Enforcement Initiative, which is training a national cadre of prosecutors and disseminating investigation and

prosecution tool to help bring cases against those who use ghost guns to commit crimes. As President Biden said during an event at the New York Police Department headquarters, if you use a ghost gun to commit a crime "not only are state and local prosecutors going to come after you, but expect federal charges and federal prosecution as well."

**Additional executive action to reduce gun violence**

Today's final rule includes two additional actions to make our communities safer.

First, the final rule ensures that firearms with split receivers are subject to regulations requiring serial numbers and background checks when purchased from a licensed dealer, manufacturer or importer. Decades ago, ATF issued a regulation defining the "frame or receiver" of a firearm as the part that is regulated by the Gun Control Act – meaning that is the part that triggers federal serialization, background check, and other requirements. At that time, many firearms in the United States were single-framed firearms, like revolvers, that house key components in a single structure. However, we have seen the increasing popularity of firearms using split or multi-part receivers that house key components in multiple structures. Some courts have recently interpreted decades-old regulatory text in a way that, if broadly applied, could mean that as many as 90 percent of firearms in the United States today would not have a frame or receiver subject to federal regulation. The final rule updates the regulatory definitions of "frame" and "receiver" to ensure that firearms using split or multi-part receivers continue to be covered by our common-sense gun laws.

Second, the final rule requires federally licensed firearms dealers to retain key records until they shut down their business or licensed activity. At that time, these dealers must transfer the records to ATF, just as they are currently required to do at the end of licensed activity. Previously, these dealers were permitted to destroy most records after 20 years, making it harder for law enforcement to trace firearms found at crime scenes. According to ATF's National Tracing Center, on average more than 1,300 firearms a year are untraceable because the federally licensed firearms dealer destroyed the relevant records that were more than 20 years old.

**Implementing the President's comprehensive gun crime reduction strategy**

This final rule is part of the President's comprehensive gun crime reduction strategy. President Biden made more progress on executive actions to reduce gun violence than any other President during their first year in office. You can read more about the Administration's whole-of-government approach to reduce gun crime here.

President Biden's fiscal year 2023 budget calls on Congress to deliver the funding needed to implement the President's comprehensive strategy to reduce gun crime and make our communities safer. These additional resources will fund accountable policing, including by putting more police officers on the beat, and making essential investments in crime prevention and community violence intervention.

Congress needs to do its job by passing this budget and other essential legislation to reduce gun crime, including legislation to require background checks for all gun sales, ensure that no terrorist can buy a weapon in the United States, ban the sale and possession of unserialized firearms — ghost guns, ban assault weapons and high-capacity magazines, and repeal gun manufacturers' protection from liability.

###

EXHIBIT B



**EVERYTOWN**
FOR GUN SAFETY • SUPPORT FUND

ISSUES

# Ghost Guns

WHAT IS THE PROBLEM?

A ghost gun is a do-it-yourself, homemade gun made from easy-to-get building blocks that can be purchased with no background check and no questions asked. These guns are made by an individual, not a federally licensed manufacturer or importer. Ghost guns are the fastest-growing gun safety problem facing our country.

In less than one hour, these self-made weapons become fully functioning, untraceable firearms. A person can buy the parts and assemble a ghost gun without even receiving a background check.

They are becoming a weapon of choice for violent criminals, gun traffickers, and other legally prohibited persons. Federal authorities should act to ensure that the core parts for ghost guns are defined as firearms and properly regulated. States should also consider immediate action to regulate ghost guns.

WHAT DOES THE ATF CONSIDER TO BE A FIREARM?

**The difference between an unfinished frame or receiver and a finished, ready-to-use frame or receiver is a few tools and a couple of hours of work.**



WHY IS IT AN ISSUE?

# Criminals can easily build a gun in under an hour.

Decades ago, it may have required certain technical knowledge and skill to convert an unfinished firearm frame or receiver into a fully functioning firearm, but those days are over. Today, with just a few tools and less than an hour, a person with no gunsmithing skills can take an unfinished frame or receiver and make it into a working firearm. Online sellers have tapped into this market, becoming one-stop shops for ghost gun parts, tools, and how-to guides. And these sellers openly promote that their products are designed to evade ATF regulation. It should come as no surprise that ghost gun recoveries across the U.S. are on the rise, and have recently been connected with criminal enterprises, gun trafficking rings, and far-right extremists.

**BY THE NUMBERS**

| | |
|---|---|
| **26**<br><br>There is at least one seller in 26 states across the country who is selling the core building blocks for a ghost gun.<br><br>Stat | **2/3**<br><br>More than ⅔ of the 80 online firearms sellers identified started selling ghost gun building blocks only within the past 5 years.<br><br>Stat |
| **2,500**<br><br>More than 2,500 ghost guns were connected to criminal activity in 114 federal cases from 2010 to April 2020.<br><br>Stat | **30%**<br><br>30 percent of guns recovered by ATF in California have no serial number on them, making it impossible for law enforcement to trace.<br><br>Stat |

**WHAT ARE THE SOLUTIONS?**

## Stop Downloadable Guns

Downloadable guns, or 3-D printed guns, are serious threats to our communities. The key to stopping the spread of downloadable guns is to stop the spread of the computer code that is used to 3-D print the firearm or its parts.

# Featured Resources





**Ghost Guns Recoveries and Shootings**

Everytown Research & Policy has collected examples of reported murders and shootings using ghost guns since 2013.

Data Tracker

**Undeniable: How Long-Standing Loopholes in the Background Check System Have Been Exacerbated by COVID-19**

Loopholes must be addressed to ensure that guns are not sold without a completed background check.

Report





**ATF & the Rising Threat of Ghost Guns**

Ghost guns are emerging as a weapon of choice for criminals, gun traffickers, extremists, and others banned from legally buying firearms.

Fact Sheet

# All Resources

### The Smoking Gun

An online resource committed to exposing the gun industry's role in our gun violence epidemic today.

Everytown Research & Policy

### The Gun Industry's Power Broker: A Closer Look at the National Shooting Sports Foundation (NSSF), the Front Group for America's Gun Makers and Sellers



The NSSF isn't as well known as the NRA, but it is just as extreme and exacerbates our gun violence epidemic.

Report

### ATF's Final Rule to End the Proliferation of Dangerous, Untraceable Ghost Guns

The ATF announced a final rulemaking clarifying that the core building blocks of ghost guns are firearms under the law.

Fact Sheet

### Update Background Check Laws

Updating federal and state laws to require background checks on all gun sales is a common-sense way to keep guns out of the wrong hands.

**Fact Sheet**



---

### Untraceable: The Rising Specter of Ghost Guns

Ghost guns are do-it-yourself, homemade guns made from easy-to-get, unregulated building blocks.

**Report**



---

### Assault Weapons and High-Capacity Magazines

Many of the deadliest mass shootings in the United States have been carried out with assault weapons and high-capacity magazines.

**Fact Sheet**